12-1834

_____

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

MIDWEST FOSTER CARE AND
ADOPTION ASSOCIATION, et al.,

Plaintiffs-Appellants,

v.

BRIAN KINKADE, et al.,

Defendants-Appellees.

_____

On Appeal from the U.S. District Court
for the Western District of Missouri

_____

BRIEF OF APPELLEES

_____

Respectfully submitted,

CHRIS KOSTER
Attorney General

JAMES R. LAYTON
Solicitor General
Missouri Bar No. 45631
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800
(573) 751-0774 (facsimile)
James.Layton@ago.mo.gov

ATTORNEYS FOR APPELLEES

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

STATEMENT OF FACTS .......................................................... 1

SUMMARY OF ARGUMENT ................................................... 3

ARGUMENT ............................................................................... 4

I.    Plaintiffs cannot proceed under § 1983 unless Congress "unambiguously conferred" upon them a right to foster care maintenance payments from the State. ........................................ 6

II.    Neither the Child Welfare Act generally, nor the provisions relating to the payment of foster care maintenance expenses specifically, "unambiguously confer" a private right of action on these or any other plaintiffs. ........................................................ 10

CONCLUSION ......................................................................... 20

CERTIFICATE OF COMPLIANCE AND OF SERVICE ..................... 21

i

# TABLE OF AUTHORITIES

**CASES**

*Blessing v. Freestone,*

     520 U.S. 329 (1997)..................................................................*passim*

*Cannon v. University of Chicago,*

     441 U.S. 677 (1979) .................................................................. 16

*Center for Special Needs Trust Admin., Inc. v. Olson,*

     676 F.3d 688 (8th Cir. 2012) ............................................... 12, 17

*Gonzaga Univ. v. Doe,*

     536 U.S. 273 (2002)..................................................................*passim*

*Lankford v. Sherman,*

     451 F.3d 496 (8th Cir. 2006) .................................................*passim*

*Missouri Child Care Ass'n v. Cross,*

     294 F.3d 1034 (8th Cir. 2002) .................................................. 18

*Pediatric Specialty Care, Inc. v. Arkansas Dept. of Human Serv.,*

     443 F.3d 1005 (8th Cir. 2006) .................................................... 9

*Pennhurst State School and Hospital v. Halderman,*

     451 U.S. 1 (1981) .................................................................. 5, 8

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*

     397 F.3d 56 (1st Cir. 2005) ........................................................ 9

Appellate Case: 12-1834    Page: 3    Date Filed: 08/09/2012 Entry ID: 3941159

*Sam M. ex rel. Elliott v. Chafee,*

    800 F.Supp.2d 363 (D.R.I. 2011) .......................................................... 15

*Suter v. Artist M.,*

    503 U.S. 347 (1992) ............................................................................ 15

*Watson v. Weeks,*

    436 F.3d 1152 (9th Cir. 2006) ............................................................... 9

*Wilder v. Virginia Hosp. Assn.,*

    496 U.S. 498 (1990) ................................................................... 8, 9, 10

**STATUTES**

§ 210.167(1)(2), Mo. Rev. Stat. ............................................................... 1

§ 210.617, Mo. Rev. Stat. ........................................................................ 1

20 U.S.C. § 1232g ................................................................................. 11

20 U.S.C. § 1232g(b)(1) ......................................................................... 11

42 U.S.C. § 671 ..................................................................................... 13

42 U.S.C. § 671(a)(11) ............................................................................ 13

42 U.S.C. § 672 .................................................................... 2, 11, 13, 16

42 U.S.C. § 672(a) .............................................................................. 2, 4

42 U.S.C. § 672(a)(1) ............................................................. 3, 10, 11, 12

42 U.S.C. § 675(4)(A) ..................................................................*passim*

42 U.S.C. § 1320a-2 ............................................................................... 15

iii

42 U.S.C. § 1320a-2a(a) ................................................................ 14, 17

42 U.S.C. § 1320a-2a(b)(3) ................................................................ 14

42 U.S.C. § 1320a-2a(b)(4)(A) ............................................................ 14

42 U.S.C. § 1320a-2a(b)(4)(C) ............................................................ 14

42 U.S.C. § 1983 .................................................................... *passim*

42 U.S.C. § 2000d ......................................................................... 11

45 C.F.R. § 1355.35(a)(i)(v) ............................................................... 14

Art. I, § 8, U.S. Const. ..................................................................... 4

Appellate Case: 12-1834    Page: 5    Date Filed: 08/09/2012 Entry ID: 3941159

## STATEMENT OF FACTS

This case began when the Appellants/Plaintiffs, Midwest Foster Care and Adoption Association and six foster parents (collectively, "Association"),[1] filed a Complaint in the U.S. District Court for the Western District of Missouri. Joint Appendix ("J.A.") at 1-20. The Association named as defendants Brian Kinkade, Director of the Missouri Department of Social Services, and Candace Shively, Director of the Department's Children's Division (collectively, "Directors"). *Id.* at 7-8.

The Association sought declaratory and injunctive relief, based on allegations regarding both the methodology for calculating and the amount actually being paid by the State of Missouri for foster care maintenance payments to foster care providers, asserting that the State was violating the

---

[1] Also named as a plaintiff was the Missouri State Foster Care and Adoption Board, which the plaintiffs indicated in their Complaint (J.A. at 6) was created pursuant to Mo. Rev. Stat. § 210.617. In their motion to dismiss, the Directors pointed out that the governor had never appointed members to the statutory Board, so even assuming that the Board has authority to sue, the Board could not have met and authorized suit, nor authorized private counsel to represent it. *See* J.A. at 79, 83-85. In response, the plaintiffs pointed out that there was an independent, private "Board" before the statute was passed, and then claimed (without citation to any authority whatsoever) that the members of the private, pre-statute "Board" now sit as members of the official, post-statute Board even though none of them were appointed by the governor with advice and consent of the Missouri State Senate, as Mo. Rev. Stat. § 210.167(1)(2) requires. J.A. at 103-04. Because the district court was right as to the nonexistence of a private right of action, this Court need not address the rather astounding claim that someone never appointed by any governor can be a voting member of the Board.

1

terms of a statute under which the federal government reimburses states for some foster care expenses, 42 U.S.C. §§ 672(a) and 675(4)(A).  J.A. at 17-18.

The Directors moved to dismiss because there is no private right of action to enforce 42 U.S.C. §§ 672(a) and 675(4)(A).  J.A. at 78.  After hearing from the Association (J.A. 92-108), the district court granted the motion to dismiss, holding that there is no private right of action to sue under the statutes the Association invoked (J.A. 117-126).

Appellate Case: 12-1834     Page: 7     Date Filed: 08/09/2012 Entry ID: 3941159

## SUMMARY OF ARGUMENT

In two cases, *Blessing v. Freestone*, 520 U.S. 329 (1997) and *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), the U.S. Supreme Court defined a set of criteria to be used to determine when a federal statute creates a right that private citizens can enforce via suit brought under the civil rights law, 42 U.S.C. § 1983. The key criterion here is that only those rights that are "unambiguously conferred" on individuals can form the basis for such a suit.

The language of 42 U.S.C. § 672(a)(1) limits the payments made by the states to those caring for children in foster care for which the states can be reimbursed with federal funds. It does not promise anything to qualified recipients. And the statute cannot be read as a whole to promise individual payments; it creates instead an approach under which the federal and state governments work together to ensure that federal reimbursements are covering the costs Congress intended to fund. The district court correctly held that the provisions at issue lack the individual focus that to the Supreme Court has required for finding that a federal spending program gives rise to a cause of action under § 1983.

3

Appellate Case: 12-1834    Page: 8    Date Filed: 08/09/2012 Entry ID: 3941159

## ARGUMENT

### *Introduction*

This appeal involves an exercise of the spending power given to Congress in Art. I, § 8 of the Constitution of the United States. Appellants/Plaintiffs Midwest Foster Care and Adoption Association and others (collectively, "Association") seek higher reimbursement for "foster care maintenance payments" under 42 U.S.C. § 672(a).[2] Such payments by the states are partially reimbursed by the federal government under the Child Welfare Act, of which § 672(a) is part.

Congressional exercise of its spending clause power does not, of course, automatically grant to individuals the ability to seek judicial action to force compliance with what those individuals think Congress had in mind. In fact, the U.S. Supreme Court has declared that the "typical remedy for state

---

[2] As a technical matter, the Association's Complaint seeks the remedy of having the Directors promulgate a methodology for reimbursement of "foster care maintenance payments," a remedy that may not necessarily result in higher reimbursement rates. The Association nonetheless relied on greatly below, and to a significant extent reiterates here, a claim that Missouri's current reimbursement rates are not high enough and that any methodology that does not result in higher reimbursement rates would be contrary to the Child Welfare Act. Even if the Association and its members had an enforceable right to bring this suit, the question of the adequacy of reimbursement rates calculated under a potential methodology would not be ripe for determination. A suit seeking an increased reimbursement rate would only be ripe once the DSS promulgates the first methodology. Thus the Association is right to ask this Court merely to vacate the dismissal and remand – and the Court should be wary, if it chooses that direction, of using language that suggests it is prejudging monetary issues.

4

noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), quoted with approval, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002). Courts have "rarely found" exceptions to that general rule. *Lankford v. Sherman*, 451 F.3d 496, 508 (8th Cir. 2006).

The Association believes that the foster care expense provisions of the Child Welfare Act create one of those exceptions. In making that assertion, it does not point to any language in the Act that says foster children or those who care for them can sue. Instead, it finds an implied right to sue: it claims that Congress gave its members an individual right to such payments, and that their right can be enforced through 42 U.S.C. § 1983.

Section 1983 makes "[e]very person who, under color of any statute … of any State …, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, … liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

But § 1983 does not provide a cause of action to every person who claims to have been adversely affected by a violation of federal law. As discussed below, the Supreme Court has held that § 1983 is available only

5

when Congress, in the federal law sought to be enforced, has "unambiguously conferred" an enforceable private "right" on the plaintiffs. *Gonzaga Univ. v. Doe*, 536 U.S. at 283, quoted with approval, *Lankford v. Sherman*, 451 F.3d at 508. When it passed the Child Welfare Act, Congress did not "unambiguously confer" such a right on the members of the Association, nor on anyone else. The district court's decision to dismiss the Complaint was thus correct.

I. **Plaintiffs cannot proceed under § 1983 unless Congress "unambiguously conferred" upon them a right to foster care maintenance payments from the State.**

The test to be used to decide whether plaintiffs can use a cause of action under § 1983 to sue regarding the Child Welfare Act's foster care maintenance payment provisions was defined in two U.S. Supreme Court cases: *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) and *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002).

In *Blessing*, the Court set out three requirements, all of which must be met before a federal statute will be read to confer a right enforceable under 42 U.S.C. § 1983: (1) Congress must have intended that the provisions in question benefit the plaintiff; (2) the plaintiff must demonstrate that the right protected by the statute is not so vague and amorphous that its enforcement would strain judicial resources; and (3) the provision giving rise

6

to the right must be couched in mandatory, rather than precatory, terms. 520 U.S. at 340-41.

In *Gonzaga*, the Court strengthened the first of the *Blessing* requirements, stressing that nothing "short of an unambiguously conferred right" supports a § 1983 claim. 536 U.S. at 283. "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.* (emphasis in original).

This Court has recognized that *Gonzaga* modified the *Blessing* test – most explicitly in its description of the *Blessing-Gonzaga* relationship in *Lankford v. Sherman*. There the Court restated the three-part test from *Blessing*, described *Gonzaga* as having "clarified the first prong" of the *Blessing* test, then extracted from *Gonzaga* (and choose itself) words that demonstrate that the bar imposed by the first prong demands much more than a plausible argument that the language of a statute could be read to assure some benefit to some individuals:

> In *Gonzaga University v. Doe*, the Supreme Court clarified the first prong, holding that "*anything short of an unambiguously conferred right*" does not support an individual right of action under section 1983. … As section 1983 enforces "rights," as opposed to "benefits" or "interests," the statutory language must *clearly evince* an intent to individually

7

> benefit the plaintiff. … Accordingly, *the statute must focus on an individual entitlement* to the asserted federal right, rather than on the aggregate practices or policies of a regulated entity, like the state. …

451 F.3d. at 508-09 (citations omitted; emphasis added).  After *Gonzaga*, a statute that does not "focus" on potential or actual individual recipients, does not "clearly evince" individual entitlement, or otherwise does not "unambiguously confer" a right on actual or potential recipients, does not create a "right" enforceable through § 1983.

The Court in *Gonzaga* was on a road leading to even fewer holdings of private rights of action in spending clause cases than the three isolated instances cited there.  ("Since *Pennhurst*, only twice have we found spending legislation to give rise to enforceable rights."  536 U.S. at 280.)  That is evident from the Court's discussion of one of its prior spending clause decisions, *Wilder v. Virginia Hosp. Assn.*, 496 U.S. 498 (1990).  There, the Court held that the Medicaid funding statutes created a private right under § 1983 for hospitals to get appropriate reimbursement for health care provided.  In *Gonzaga* the Court disavowed at least any extension of the *Wilder* holding:  Immediately after describing *Wilder*, the Court said, "Our more recent decisions, however, have rejected attempts to infer enforceable rights from Spending Clause statutes."  *Gonzaga*, 536 U.S. at 281.

8

Today, there is no legitimate question whether in *Gonzaga* the Court "tightened up the *Blessing* requirements." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 73 (1st Cir. 2005). Thus when in *Lankford* this Court applied the *Blessing-Gonzaga* test, the Court looked for some commitment made directly to "'individuals' or 'persons,'" but did not find such a commitment – an omission that the court deemed to be "'fatal under *Gonzaga.*'" *Id.* at 509, quoting *Watson v. Weeks*, 436 F.3d 1152, 1162 (9th Cir. 2006). And the Court looked for the "focus" of the law at issue, which it found was not "on an individual entitlement to medical services, [but] on the aggregate practices of the states." 451 F.3d at 509. A focus on the state program, rather than on individuals, meant that the statute was "insufficient to establish an individual right to reasonable standards under the first prong of the three-part test." *Id.*

Once since *Gonzaga* this Court has suggested that *Gonzaga* may not matter – but only in a very specific instance. In *Pediatric Specialty Care, Inc. v. Arkansas Dept. of Human Serv.*, 443 F.3d 1005 (8th Cir. 2006), the Court recognized the strength of the *Gonzaga* rule, which Arkansas asserted "foreclose[d] private causes of action based on the Medicaid Act." 443 F.3d at 1014-15. But this Court recognized that the Supreme Court held otherwise in *Wilder*, and then, dispositively, that in *Gonzaga* the Supreme Court "did not overrule *Wilder.*" 443 F.3d at 1015. Even then, the Court went on to

9

discuss the facts before it in *Gonzaga*-consistent terms, asked whether, "[r]ather than *focusing* on an individual entitlement … [the Act] *focuses* on the aggregate practices of the states." *Id.* at 509 (emphasis added).

The first step, then, of the *Blessing* test, as it must be applied in the wake of *Gonzaga,* is to determine whether the Child Welfare Act "unambiguously confer[s]" a private right on these plaintiffs. The answer is "no." The Act never "focuses" on individuals; the language and the scheme are aimed at helping and, perhaps, improving state programs that serve children in foster care in the "aggregate."

## II. Neither the Child Welfare Act generally, nor the provisions relating to the payment of foster care maintenance expenses specifically, "unambiguously confer" a private right of action on these or any other plaintiffs.

The Association claims for its members an enforceable right stemming from 42 U.S.C. § 672(a)(1). That provision requires that each participating state "with a plan approved under this part shall make foster care maintenance payments on behalf of each child [who qualifies]… ." Then, § 675(4)(A) defines qualifying maintenance expenses. To find whether those foster care maintenance provisions really are among the rare instances where a private right of action is available through § 1983, we begin with that language.

We know, from *Gonzaga* and from other cases, that statutes like the Civil Rights Act of 1964 qualify, based on declarations like, "[n]o person in the U.S. shall…[be subject to discrimination]." 42 U.S.C. § 2000d (1994 ed.), quoted in *Gonzaga*, 536 U.S. at 284, n. 3. The Court found the same language in Title IX of the Education Amendments of 1972. 536 U.S. at 284. In both instances, the language focused on and, in effect, made a promise to individuals.

By contrast, the Court in *Gonzaga* found no such focus on, nor such promise to, individuals in the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g. The FERPA used words that can refer to individuals – "students" and "parents" (20 U.S.C. § 1232g(b)(1)) – but only in the context of defining the terms of a qualifying government program, and without any individual promise of the sort that would create an individual discrimination claim under Title IX or the Civil Rights Act. In describing the FERPA, the Court reiterated its language in *Blessing*: "Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the system-wide performance of a State's Title IV-D program." *Blessing,* 520 U.S. at 343, quoted in *Gonzaga*, 536 U.S. at 281.

The language cited in *Gonzaga* from the Civil Rights Act and from Title IX provides a stark contrast to the language found in 42 U.S.C. §§ 672 and 675(4)(A), at issue here. As noted above, § 672(a)(1) merely says that "[e]ach

11

State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative… ."  Then § 675(4)(A) defines eligible "foster care maintenance payments" as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, [etc.]… ."  The two sections, combined, constitute typical funding statute language, not in any way comparable to the language endorsed in *Gonzaga*.  If Congress had wanted to place this statute in the realm of the Civil Rights Act and Title IX, it could have written something like the language in those statutes – perhaps, "no foster care child shall receive any less money under a State Plan than what is required to provide for their food, shelter [etc.]".  But it chose not to do so.

The language here is also quite different from the language at issue in *Center for Special Needs Trust Admin., Inc. v. Olson,* 676 F.3d 688, 699 (8th Cir. 2012).  Paragraph 1396p(d)(4)(C), at issue there, could be fairly said to "address[] the Center's business" and "not solely tell the state how to act" protects "[a] trust containing the assets of an individual who is disabled (as defined in section 1382c(a)(3) of this title) that meets the following conditions …."  676 F.3d at 699.  By contrast, § 672(a)(1) *does* "solely tell the state how to act":  again "[e]ach State with a plan approved under this part shall make foster care maintenance payments."  Congress could change the focus of that language from the state ("shall make payments") to the

12

individual (perhaps, "shall be paid" or "shall receive"). But again, Congress chose not to do so.

The "focus" that matters is Congressional, not judicial – *i.e.*, the question is whether Congress enacted a law that focused on individuals, not whether a plaintiff can persuade a court to focus on particular language within a statute. And so long as Congress declines to change the language of §§ 672 and 675(4)(A) to focus on the payee rather than the payor, to find that the "focus" of the foster care maintenance provisions of the Child Welfare Act is on payees would require more than the study of those two provisions. The Court would have to look at all relevant parts of the statute, ascertaining how the language the Association cites fits into the scheme as a whole. And here, the scheme is not focused on individual foster children or those caring for them; it is focused on the State having, implementing, and perhaps improving a plan to serve them.

The lynchpin of the Act is the mandate that the State have a federally-approved plan: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which … ." 42 U.S.C. § 671. That funding regime requires states to provide for periodic review of the amounts paid as foster care maintenance payments "to assure their continuing appropriateness." *See* 42 U.S.C. § 671(a)(11). Perhaps most

13

importantly, the statutes specifically set forth the methods by which the states can be pushed to improve plans, or to improve their implementation.

Most dramatic, of course, is for the Secretary to withhold funding from a State for failure to abide by a proper plan. *See* 42 U.S.C. § 1320a-2a(b)(3). But even if a State does not fully comply with its approved plan, withholding is not automatic. Indeed, the statute provides that even if the State is not in "substantial conformity" with the approved plan (42 U.S.C. § 1320a-2a(a)), the federal government will still give the state "an opportunity to adopt and implement [an improvement plan] approved by the Secretary, designed to end the failure to so conform." 42 U.S.C. § 1320a-2a(b)(4)(A). The pertinent federal regulations then provide for the use of "benchmarks … to measure the State's progress." 45 C.F.R. § 1355.35(a)(i)(v). While the State is working with the Secretary to improve its plan or its compliance, any withholding of funds is suspended. 42 U.S.C. § 1320a-2a(b)(4)(C).

This comprehensive, cooperative approach to federal subsidization of foster care maintenance payments belies the idea that the specific sections cited by the Association were intended by Congress to create a right enforceable under 42 U.S.C. § 1983, particularly in light of *Gonzaga*. The approach consists not just of the lynchpin – the state plan – but of a Congressionally-mandated method for approving and improving that plan and its implementation. Nothing in the structure of that approach suggests

14

that Congress intended to also have private plaintiffs, claiming to have been deprived of State funding, take an active enforcement role.

As part of its argument to the contrary, the Association cites a statutory change – what it calls the "Suter Fix" (App. Br. at 24, citing 42 U.S.C. § 1320a-2), a reference to *Suter v. Artist M.,* 503 U.S. 347 (1992). Then, in a parenthetical, it distills the "Suter Fix" into these words:  "the Suter Fix precludes courts from relying *solely* on the existence of state plan requirements when considering whether a statutory provision is individually enforceable under section 1983."  App. Br. at 25 (emphasis added), describing the holding in *Sam M. ex rel. Elliott v. Chafee*, 800 F.Supp.2d 363, 385-86 (D.R.I. 2011).  We agree with that description – both of the language of the statutory change and of the caselaw.

But here, the district court did not "rely[] solely on the existence of state plan requirements."  Rather, it considered the language of the pertinent provisions and the structure and content of the entire Act – precisely what *Gonzaga* required it to do.  In the "Suter Fix" Congress merely eliminated the shortcut that the Supreme Court took in *Suter*:  to find that there is a requirement for a state plan, and hold that alone is enough to bar someone from claiming a judicially-enforceable right to enforce its view of the Child Welfare Act.  But eliminating that shortcut is all that Congress did.  Though Congress could also have "unambiguously conferred" a private right to foster

Appellate Case: 12-1834     Page: 20     Date Filed: 08/09/2012 Entry ID: 3941159

care maintenance levels at some yet-to-be defined level, it did not do so, leaving the question subject to subsequent judicial doctrines – here, to the *Blessing* test, as now modified by *Gonzaga*.

In sum, Congress did not, "in sections 672(a) and 675(4)(A)," whether read in isolation or in the context of the Child Welfare Act as a whole, "embod[y] all of the characteristics that the *Gonzaga* Court considered to evidence congressional intent to benefit the plaintiffs in this litigation." App. Br. at 30. Again, where the Association finds a "stark contrast" (App. Br. at 31) between the language here and the language in FERPA, we find a similar contrast between the language here and the language in the Civil Rights Act and Title IX – the only language that the Court said in *Gonzaga* would "clearly evince" a conclusion that the statute is aimed directly at foster children and caregivers, rather than at state plans to assist those persons. Moreover, the content and context of the Child Welfare Act, particularly the Act's mechanisms for working through improvements in state plans, demonstrate an "unmistakable focus" (*Cannon v. University of Chicago*, 441 U.S. 677, 691 (1979), quoted in App. Br. at 31) not "upon foster care providers," but upon evolving state development and implementation of plans.

Read in context, the foster care maintenance provisions are merely prerequisites for federal funding – *i.e.*, the promise that federal moneys will

Appellate Case: 12-1834     Page: 21     Date Filed: 08/09/2012 Entry ID: 3941159

reimburse the states only for payment of expenses that Congress deemed to qualify for the federal subsidy – not promises to individuals of either federal or state dollars. They do not meet the first requirement of the *Blessing* test, as it stands after *Gonzaga*. Thus the district court's decision to dismiss the case was correct.

There is no need, then, to address the second and third parts of the *Blessing* test. But particularly with regard to the second, it is worth noting that the Association has overstated the precision of the statute in a very significant respect – one that hearkens back to our discussion of the statutory scheme. The Association essentially ignores the fact that what the statute actually requires is not payment of every penny of every qualifying expense to every caregiver, but only of "substantial conformity" with a plan that addresses defined expenses. 42 U.S.C. § 1320a-2a(a) (2006 and Supp. V 2011).[3] Rather than attempt to explain how a court would apply the "substantially conform" standard, the Association implicitly suggests (App. Br. at 41) that the court can completely bypass it. In the Association's view, courts can leap directly to the foster care maintenance payment provisions themselves – even though what the statute unambiguously requires is merely substantial conformity with a plan that provides for such payments. Nothing

---

[3] Notably, the "substantial compliance" mandate in 42 U.S.C. § 1320a-2a(a) applies only to "parts B and E of subchapter IV" and not to the Medicaid provisions at issue in *Center for Special Needs Trust*.

17

in the language or structure of the Child Welfare Act endorses the Association's approach.

And indeed it seems odd, at the very least, to even suggest that Congress would permit it. After all, Congress chose to only let the federal government sanction a failure to meet the foster care maintenance requirements when the state does not "comply substantially" with the approved plan. And the states acted pursuant to that express requirement, knowing that it granted them some leeway. Why, then, should this Court conclude that Congress at the same time handed to private litigants the ability to demand precise compliance?

Finally, the Association returns (App. Br. at 42) to the enforcement mechanisms in the Child Welfare Act, arguing that the State cannot use some remedial scheme in the statute to rebut the claimed presumption that the maintenance provisions meet the three-part, *Gonzaga*-modified *Blessing* test. We do not disagree that the scheme the Association describes is not a remedy for individuals who think they are entitled to more money from the State. This Court has already said otherwise. *Missouri Child Care Ass'n v. Cross*, 294 F.3d 1034, 1040 n. 8 (8th Cir. 2002). But the Association significantly understates the federal role when it labels the Secretary's responsibility as "essentially ministerial." App. Br. at 43. How can that statement be reconciled with the scheme that provides for not just ongoing

18

review but modification of the State's plan, based on what is learned from implementation? *See* at pp. 14-15, *supra*.

That state payments may vary today (App. Br. at 43) is no proof that the federal agency lacks enforcement power, nor that Congress intended to hand that power to plaintiffs and the judiciary. Ultimately, the Secretary may require one state to raise its payments or lower its reimbursement request (or more accurately, given the posture of this case (*see* n. 1, *supra*), change its method of calculation). But the statute provides the mechanism by which such a change would be required. That mechanism that might well involve caregivers' input to the federal and state agencies, but that does not, under the *Blessing* test as redefined in *Gonzaga*, allow a private plaintiff to ask a court to require. Whether the Secretary has actually used her authority to force consistency among the states is entirely irrelevant to the question here: whether Congress, when it passed the Child Welfare Act, "unambiguously conferred" on individual caregivers the authority to obtain judicial interpretation and enforcement of what those caregivers believe to be the proper meaning of 42 U.S.C. § 675(4)(A).

19

## CONCLUSION

For the reasons stated above, the Court should affirm the dismissal of the suit below.

Respectfully submitted,

**CHRIS KOSTER**
Attorney General

/s/ *James R. Layton*
JAMES R. LAYTON
Solicitor General
Missouri Bar No. 45631
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800
(573) 751-0774 (facsimile)
James.Layton@ago.mo.gov

20

## CERTIFICATE OF COMPLIANCE AND OF SERVICE

The undersigned hereby certifies that on this 9th day of August, 2012, the foregoing Brief of Appellees was filed electronically with the Court's CM/ECF system, with service accomplished to counsel of record through the CM/ECF system. The undersigned further certifies that one true and correct paper copy of the Brief of Appellees, upon receiving notification from the Court that the electronic version of the Brief of Appellees has been accepted and docketed, will be sent to the following via First-Class mail, postage prepaid:

J. Eugene Balloun
Lori Burns-Bucklew
Michael Barnett
Lynn Herndon
Dana Strueby
SHOOK, HARDY & BACON, LLP
2555 Grand Blvd.
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547

*Attorneys for Appellants
Midwest Foster Care and
Adoption Association, et al.*

Stephen Douglas Bonney
Daniel Hyndman
ACLU FOUNDATION OF KANSAS
    AND WESTERN MISSOURI
3601 Main Street
Kansas City, MO 64111
Tel. (816) 756-3113
Fax (816) 756-0136

Anthony E. Rothert
Grant R. Doty
ACLU OF EASTERN MISSOURI
454 Whittier Street
St. Louis, MO 63108
Tel. (314) 652-3114
Fax (314) 652-3112

*Attorneys for Amicus Curiae
ACLU*

21

J. Richard Hammett (Lead
   counsel)
Elizabeth Yingling
Brandon Moseberry
Mireille Zuckerman
Joe Rindone
Celina Joachim
Emily Harbison
BAKER & MCKENZIE LLP
Pennzoil Place
711 Louisiana, Suite 3400
Houston, TX 77002
(713) 427-5016

Pro Bono Counsel for *Amicus
Curiae Children's Rights*

Ira Lustbader
Jodi Miller
CHILDREN'S RIGHTS
330 Seventh Avenue
4th Floor
New York, NY 10001
(212) 683-2210

*Attorneys for Amicus Curiae
Children's Rights*

The undersigned further certifies that the foregoing brief complies with the limitations contained in Rule 32(a)(5) and 32(a)(6), and that the brief contains 4,820 words. The undersigned further certifies that the Brief of Appellees has been scanned for viruses and is virus free.

/s/ *James R. Layton*
James R. Layton

2